The last matter on calendar for argument today is John Doe v. Jami Snyder 21-1568. Good morning, your honor. As a sophomore, Plaintiff Appellant John Doe, I'd like to proceed. Thank you, your honor. John Doe is a 16-year-old transgender boy on Medicaid in Arizona who urgently needs male chest reconstruction surgery. Arizona has a categorical exclusion for gender reassignment surgeries that is denying him the opportunity to demonstrate that male chest reconstruction surgery is medically necessary for him, let alone to obtain that coverage. Sorry, your honor. I didn't hear your question. I just want to make sure I don't see you on the screen. I'm on a VTC, your honor, and the court has control of my video. That's not him? No. Let's pause. All right, just stop for a second. We're going to stop the clock and try to get a better determination. Okay. Okay, we're gonna, we're gonna, this is gonna be take two. All right, we can see you now and we're restoring the clock to 20 minutes. I think I heard you say that you wanted to reserve five for rebuttal aspirationally, but go ahead and state your name and appearance again. Let me also say I'm having some difficulty understanding what you're saying. I don't know whether it's a slight echo or, but if you can make an effort to speak maybe a little slowly and distinctly, I want to make sure I hear what you have to say. I apologize, your honor. I'll definitely make sure to do that. Good morning, a sophomore for plaintiff appellant John Doe. As I indicated earlier, John Doe is a 16-year-old transgender boy who is on Medicaid in Arizona and urgently needs male chest reconstruction surgery. Arizona has a categorical exclusion that prohibits coverage for gender reassignment surgeries. That exclusion prevents John Doe from obtaining, from having his prior authorization request determined based on medical, his individualized medical necessity, let alone obtain coverage for that, for that procedure. He sought an injunction at the district court to prohibit access from considering that exclusion when considering his yet-to-be-filed prior authorization request for male chest reconstruction surgery. Let me ask you this, other than particular needs of the named plaintiffs, but I guess now we only have one, one withdrew, were there any grounds for a preliminary injunction rather than proceeding expeditiously to trial? Well, your honor, the reason for the preliminary injunction is that as the declaration submitted before the district court indicated that the delay in his ability to obtain that individualized assessment by access of medical necessity as part of their review of his prior authorization request, that delay is causing him significant psychological distress, which is something that both he talked about in his declaration, as well as the declaration of his mental health provider, Dr. Peck, which was then further supported by the sort of generalized expert declaration of Dr. Jansen, who talked about the significance of this care and the importance for the mental health of transgender young people in why a delay would be so harmful. Let me ask you this, I realize DH dismissed out and we granted that. Does that, is there anything relevant to this particular proceedings about that or for the reasons for that? No, your honor, all of the claims that were brought in this appeal or all the issues raised in this appeal were raised by both DH and John Doe, so it does not affect any of the issues before this court. Is the reason that DH decided to drop out relevant? No, your honor, the reasons for that are particular to DH and not relevant to the legal issue, which is that the exclusion discriminates against transgender people, which is sex discrimination, and that is something that the district court erred in analyzing John Doe's likelihood of success on the merits. The court incorrectly- I'm really drawing attention to the irreparable harm element, as one of the major propositions cited by the district court was that, in fact, adolescents sometimes change their mind, and so it may not be part of the record, but I couldn't help but wonder, did DH change his mind? No, your honor, DH did not change his mind, and with regards to the irreparable harm, your honor, again, there was significant evidence in the record that the delay in the treatment or delay in his ability to be considered or have his individualized medical need considered by ACCESS in determining coverage for male chest reconstruction surgery would be a delay of medically necessary treatment, and as this court held in Beltran v. Myers, even a delay that may cause a denial of medically needed care is irreparable harm, and that is where we believe that the court erred in applying the incorrect standard with regards to medical, excuse me, to irreparable harm. Well, you make an effort to argue that this is a mandatory injunction, whether it's prohibitory or mandatory. What is the significance of that? Because it seems like you are asking for, well, at the time, we're asking for both of the parties to get top surgery right away. You were ordering that to be done and paid for, right? Well, your honor, in our initial filing, we did indicate that what we were asking for was the court-to-order surgery. At the time we made that filing, our understanding was that the exclusion was the only barrier, such that if the exclusion was removed, there would be no barrier to coverage, but we further clarified in our reply brief in the oral argument, we made very clear that the scope of the injunction that we're categorical exclusion on gender reassignment surgeries when considering John Doe's request for prior authorization, so that he wouldn't- Your argument as to irreparable harm is all about the surgery. It's not about the exclusion. The harm that you have cited that John Doe, you allege, will suffer is because he can't get the surgery. That harm is not ended if the department or the agency, whatever it's called, eliminates the exclusion and then makes the judgment. His harm is linked to the inability to get the surgery. So the notion, I mean, it seems a little slight of handish to try to say, well, this isn't about the surgery anymore. It's about the exclusion. I don't think that's true. It's about the surgery. That's what the harm is linked to. Where am I wrong? Well, your honor, the harm is both. And ultimately, we are- How is the harm linked only to the exclusion independent of the surgery? I don't think it is. Well, your honor- It's all about the surgery. And that's why I'm asking, is this more than slight of hand? Isn't this about the surgery? It is in the ultimate relief, but not at the preliminary injunction stage, your honor. Under anti-discrimination law- Oh, stop right there. Stop right- Are you telling me that you're fine with the result that doesn't direct the surgery and just sends it back to the agency to make a decision? How does that end the harm? Well, your honor, based on the medical record, our client's medical records and the fact that both his mental health provider and medical provider have recommended male chest reconstruction surgery, we do not believe that there is any basis or access to lawfully deny him coverage. No, and you think that's the surgery we're talking about. And I'm not prepared to pretend otherwise. Sorry, your honor, I didn't hear your question. The question that Judge Callahan has raised, what kind of injunction is this? It seems to me it's an injunction that seeks to order action, not simply an injunction that's maintaining some status quo. Well, your honor, the action that it would order is only that access would consider the prior authorization request and conduct an individualized- All right, wait a second, please. I think Judge Bress has a question. Well, you were probably about to go to your counsel, but I have the same concern that Judge Clifton has. What you're asking is for further consideration. Isn't it fairly obvious from the disposition where that further consideration would mean they take the opposite view of the medical necessity of this? And so I just don't see how this attempt to clarify the relief being sought would ultimately be something the client would be satisfied with. That's why it seems that what you're asking for is for the surgery to be ordered. Well, your honor, I think the two responses to that, first, it would address the error that the district court made in its analysis in not treating the categorical exclusion as discrimination on the basis of transgender status and the resulting shift in the burden of proof required under heightened scrutiny. But I do think also that with regards to the question about irreparable harm, it does remove the barrier, which is the harm, which is one of the harms that is caused by this exclusion. John Doe has denied the opportunity to demonstrate that he has individualized medical need for this surgery, which is not something that is imposed on other Medicaid recipients. If we assume is what you want is the surgery and that was what was before the district court, is the standard of review abusive discretion of what the district court decided? No, your honor, we are alleging yes or no. What's the standard of review of an injunction? The standard of review is de novo because we are alleging that the district court made errors of law. Well, no, that's not it. If there are errors of law, that can affect an abuse of discretion, but it doesn't change the review to a de novo. I think we're talking past each other. It's abuse of discretion. And so I'm trying to, if you address to me that you wanted to have that surgery ordered and the district court was faced with a situation where there was conflicting medical evidence before the district court about whether when you have a juvenile and the nature of top surgery, whether the district court felt that it should be ordered right now. And if there was evidence on both sides, it still could be possible that denying your injunction was that court could affirm that. That doesn't mean you're going to win or lose a trial, but it still is abuse of discretion here. Where am I going wrong? That's correct, your honor. But I think that with regards to the irreparable harm, if I'm understanding the question correctly, is that the irreparable harm here, as we indicated in our briefs, is twofold in that had the district court correctly analyzed the sex discrimination claims under the section 1557 and the equal protection clause. And I guess in particular with the equal protection clause that a finding that a likelihood of success on the merits of an equal protection claim, there is a presumption of irreparable harm. So in that, in that regard, irreparable harm would have been demonstrated. Right, but you can't, you can't get an injunction just with an inchoate injury of law. You have to be able to show some irreparable harm to the person seeking. That's, I think, one of the grounds on which the district court felt that wasn't enough here to order a preliminary injunction. Well, your honor, the court did not find that either, that male chest reconstruction surgery never concluded that it was not medically necessary for John Doe, just that there was at least insufficient evidence at this point. But as I indicated earlier, the harm is twofold. One, in the denial of the opportunity to demonstrate that it is in fact medically necessary to access through the prior authorization request process. And then the resulting delay in his to get that assessment is causing him irreparable harm in the form of the distress caused by gender dysphoria, which is not something that is disputed here. So if we find that after Bostock, the exception here at issue likely violates federal law, would such a determination require us to vacate the district court's denial of a preliminary injunction? Yes, your honor, because by going through that process and treating this as the district court should have, as discrimination based on transgender status and sex discrimination. Discrimination on the basis of transgender status, because even if Bostock means that this that discrimination based on sexuality or sex identity is now covered, that doesn't answer the question of whether this particular statute does discriminate on that basis. But why do you claim it does? Well, the, this exclusion prohibits coverage for gender reassignment surgeries. And that is tantamount to saying that the exclusion is for surgeries that only transgender people see. And federal courts have been very clear that just like in Karnosky and other cases where by essentially using language that applies only to one group, even if it doesn't necessarily apply to all the people in that group, that is tantamount to essentially saying that this is an exclusion that discriminates against transgender people. There's no way to apply this exclusion without considering whether or not a person is transgender or considering their sex. There's other, I mean, this is not a, this is not a statute that that is a statute that eliminates from coverage certain procedures that the state for different reasons likely has decided it doesn't want to cover. And some of those procedures are specific women. So would you say that, that those procedures are also, that's discrimination against women because they're the ones who would need those procedures? Your Honor, in those situations, we're not saying that access can't have otherwise lawful, you know, non-discriminatory reasons, but it would still have to meet the standards set forth, but it would still have to meet heightened scrutiny. If it, if it is targeted towards women, I think that is the, the procedure that a certain population would be the recipients of. I'm not sure that that complex facial statute here has been in place. I think since the early 1980s, there are other parts of the statute that do provide treatment for transgendered persons. And here we have a list of different procedures that are disallowed. I'm just not sure that why we should assume that there's facial discrimination without more. Well, Your Honor, the fact that they categorically exclude surgery for transgender people, it is enough. That in and of itself is a categorical exclusion. It is irrelevant. We're entitled to other different forms of surgery. This is not a categorical exclusion of all surgery for persons who are transgender. This is a categorical exclusion. Right. But it is a type of surgery that only transgender people would require. And as a result, it is, it is an exclusion that discriminates against transgender people. Do you want a balance of your time for rebuttal? Yes, Your Honor. Thank you very much. I want to make sure. Do either of you want to ask questions? All right. We'll hear then from David Barton. Good morning, Your Honor. Good to be with you today. May I please support? My name is David Barton. I do represent Jamie Snyder, who is the director of ACCESS, which is Arizona's Medicaid agency that implements Medicaid in the state of Arizona. I want to start with this notion, the last argument made by the plaintiff that somehow the denial of a procedure that is needed by the transgender community is somehow discrimination against that community. That notion, that guilt by association argument, was rejected by the Supreme Court in a case of Bray v. Alexandria Women's Clinic. Did the district court read seven cases? And it seems to me that that's a possibility here. I don't know. I think if that's the case, then I ask the other side, does that mean we have to vacate the preliminary injunction? And does that mean that's something that will be when you have the trial? It seems to me that Bostock is not limited to Title VII cases, that that's a possible error. Justice Gorsuch said in Bostock at page 15, at page 1753, he said, the employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. Under Title VII itself, they say self-sex, segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today. But none of these other laws are before us. We've not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudice any such question today. So I think the court was very careful in Bostock to limit the analysis to Title VII, and that's important. Let me stop you there. I mean, this isn't a statement that says for this case only. It's not a Bush versus Gore one-off. It states a broad proposition with regard to how you deal with gender issues as discrimination on the basis of sex. Now, it may not apply in every instance. I think he anticipated the bathroom wars. But I have a hard time understanding why it wouldn't apply in this context, that the district court's attitude appeared to be, well, that's a Title VII only. I don't have to pay any attention to that in this context when the principles would seem to apply here. I mean, it's sort of like saying Brown versus White of education applies to Title VII, but not necessarily the principles. How is that reading of the principles articulated in Bostock? Well, the reason that it's different, Your Honor, is because of the statutory framework. Here we're talking about Medicaid. Medicaid has two provisions that are critical in this case. One is the provision found in Section 1396A of the Medicaid Act, which limits or has a list of requirements that a state must comply with in order to implement Medicaid under the state's plan. One of those requirements is that the state must ensure that it operates its plan in a way that safeguards against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care. So the federal statute in this case requires the state to make determinations about procedures that are efficient and consistent with the goals of Medicare. And the statute in particular that the plaintiffs are bringing their claim under is the Early Periodic Screening, the part of Medicare Act that they're bringing it under is the Early Periodic Screening, Diagnostic, and Treatment Services portion of Medicaid Act. That's found in 42 U.S.C. Section 1396 D.R. 5. It's the catch-all provision. Here we have a list of services that access and other states that adopt Medicare must provide. And gender reassignment surgery is not in that list, but there is a catch-all. And that catch-all says that the states must provide services that are medically necessary. So the district court engaged in the analysis here, looking at the Medicaid Act and its application to these particular plaintiffs, he said they need to show that the procedure they're seeking is medically necessary. And they failed to do so. They failed to show that it's medically necessary. So this is not- Let me ask you to pause and point me to where specifically the district court's order speaks in those terms. Of medical necessity? Correct. I think it's on page 15 of the order, Your Honor. Yes, page 13 of the order. This is based on the record and in particular the conflicting opinions provided by well-qualified experts and the lack of any evidence showing plaintiffs have been evaluated by a psychologist or psychiatrist. The court finds plaintiffs have not clearly shown that surgery is medically necessary for them or that it is safe and I take it the discussion that expands upon that is the discussion under the caption of irreparable harm. Is that correct? Because I didn't see anything else within this section that talked about that. Well, the court went on to analyze later on whether the plaintiffs have demonstrated irreparable harm and found that they had not for a number of years. That didn't really answer the medically necessary question. It may be that it's necessary, but it's necessary right away. That's what I took to be the discussion, irreparable harm. I never did find discussion in the broader terms or that, I mean, in your answering brief, you started the summary of argument by speaking in broad terms that services are not safe and effective nor medically necessary, but I didn't see the district court actually coming to those conclusions or stating any basis for those findings. Everything seemed to be in terms of, well, maybe it's not quite so urgent, so we're not going to check off the irreparable harm box, but I didn't see anything that supported the broader conclusions that you're suggesting. Actually, your honor, if you review pages, I think the court's beginning analysis from page seven all the way to 15, he considers the competing evidence that was presented by the experts with regard to the question of medical necessity and then reaches his conclusion on page 13 of the opinion that after looking at all of that evidence, he can't conclude that the plaintiffs demonstrated that this was medically necessary for them or safe and effective in general. Well, yeah, but his discussion seems to be, you got experts saying this, you had experts saying that, throw my hands up, and plaintiffs haven't proven the case. I didn't really see any logic or expression of why it is one set of opinions is taken as more persuasive than another set of opinions, and that may not be necessary at this stage, but I've got to say that the notion that there is a finding supported that this isn't safe or effective or this doesn't really do that for me. I agree with Judge Clifton. I don't think, you seem to be arguing that would then be law of the case, but it's already done. We're looking at a preliminary injunction, and that's a different standard, and looking at all of those things, I think like Judge I don't know if you said, is it WPATH or WPATH or whatever, but then you also have an expert that says that he's seen, included in all of what the judge is looking at, you not only have some conflicting evidence on whether it's the right thing to do, but you also have the overlay of these are juveniles. Now we just have the one juvenile, and then you have testimony from people that young people that had the surgery and then later regretted it. So the judge is just saying, and I mean, an argument can be made. The judge is just saying, hey, I don't think with what you've shown right here that I need to issue a preliminary injunction and order the surgery for these two people, but that doesn't mean that those issues won't all come up again at trial. And it concerns me that you're arguing that the judge already decided those issues, and I don't think the judge has. I think what the judge court said is that the plaintiffs had failed to prove that this surgery was medically necessary for them and or safe and proof at the preliminary stage of the injunction. I agree with you that these issues will be litigated and that there will be a full trial on these issues that will happen later on. There'll be a lot more evidence presented as to this question of medical necessity. The question was at the preliminary injunction stage, particularly where the plaintiffs are seeking a mandatory injunction, they had to show under the court's precedent in Anderson versus United States, that their extreme and serious damage will result and the issues are not doubtful. And that's the standard they had to meet at the preliminary injunction stage. And the court applying that standard said, look, I don't see that the plaintiffs have met that burden. And that decision by the court is reviewed for abuse of discretion. And so unless the court finds that it's not supported by any evidence, which it is, or inconsistent with the law, which it's not, then the court must defer to the court's discretion on that issue. Well, I guess hypothetically, if I disagree with your interpretation of Bostock, and I think that the court below construed Bostock too narrowly, does that have any effect on the validity of the court's ruling? Do we have to vacate the ruling? It does not, for several reasons. First of all, even if the court accepts that and that Title IX and the Medicaid Act would incorporate the definition of because of sex into those statutes, such that transgender individuals are protected class, that doesn't change the outcome here. Because even if they are protected class, they still have to show under the Medicaid Act, that these procedures are safe and effective and medically necessary for them. And so it doesn't really change the outcome at all. And quite frankly, Let's break that up. What is there, if anything, in the order that speaks, I'm going to divide it into two parts, safe and effective, and medically necessary for them. There was at least some discussion of the latter under irreparable harm. I haven't found any persuasive with regard to unsafe or ineffective. Okay, so at page eight of the order, the court talks about the Medicaid requirement, and he says federal law requires, I'm paraphrasing, but he says federal law requires access to utilize its limited resources to safeguard against unnecessary utilization of such care and services as to assure that payments are consistent with 42 U.S.C. section 1396A.30, the statute we're talking about here. And so the court was aware of Medicaid's requirement that access utilizes services in a way that ensures that they're efficient. And certainly if a procedure is not medically necessary or safe and efficient, then it's not efficient under any cost. I'm trying to divide it again into two parts. Certainly medically necessary for this plaintiff or these plaintiffs, that is addressed to some degree under irreparable harm. The first part seems to be addressed only in the sense of, well, they're experts saying this and experts saying that. And with regard to safe, it's not like I found anything in trying to look at the declarations that says it is unsafe in the sense that people die on the table or something. And effective, I guess it's arguable that effective may speak to the second thoughts concern, which the district court clearly did articulate within the irreparable harm discussion. But the notion that this is kind of way out there, experimental surgery, we're transplanting something, and nobody's ever done this before and so on and so forth. I didn't see anything in any other part of the record that I looked at that would support the proposition that this surgery is unsafe. Is there something I've missed? Yes, there is. And I would point out two things. Number one, the question isn't whether the plaintiffs or whether the court determined that this surgery was unsafe. The question is whether the case or the plaintiffs prove that it's medically necessary. That's the statutory requirements. I'm trying to break this apart. There are separate things to talk about whether regarded to these plaintiffs and whether it's necessary for them. But your language, and to some degree, the language of the district court order suggests something that is a much broader concern, which is, yeah, people die on the table, this isn't safe, or this is experimental, and nobody really knows if it's going to work and so forth. And I don't really see how those arguments pertain here. Now, this is still just a preliminary injunction. They'll be addressed again later. But I still don't see how it could be said that plaintiffs have dropped the ball with regard to whether it's safe, because I didn't see anything that supported the proposition that it was unsafe. Okay, so there was a lot of evidence to support that it was unsafe. As we pointed out, there were two experts that testified on behalf of the state, both of whom pointed out this is an irreversible procedure. Once you engage in sexual reassignment surgery, particularly for an adolescent, you've altered that adolescent's life, body for life. And as the brief submitted by the de-transitioners points out, many of those people regret that surgery, and there's no taking it back. I tried to carve that issue out because the judge talked about it in the context of irreparable harm. I'm trying to work on safe and effective and what I think are the more common medical understandings. Is somebody going to die on the tables? Is it not going to work? And I didn't see anything that supported that. I'm prepared to take on and indeed, I'd like for you to discuss the other part. But I don't want this concern about the second thoughts and people regret and so forth to expand. So suddenly this looks like some wild ass experimental surgery that caused people to I haven't seen anything that supports the broader notion. So I'd like to focus on what's really discussed here, which is this plaintiff and the impact on this plaintiff's life. So the test is safe and effective, right? The question is, does and I'm not contesting, I don't think it puts on evidence that people die on the surgery table. That's not our position. But effective requires that the plaintiff show that somehow if patients who have this surgery are better, that their gender dysphoria is better. And the evidence in that regard is significantly in favor of us. In the first place, the court recognized that the Centers for Medicaid and Medical Services declined to issue a national coverage on sex reassignment surgery because they said the clinical evidence is inconclusive. Specifically, they defined is denied to adopt the WPATH standards, which are the standards the plaintiffs rely on to suggest that somehow this is medically necessary. And the Centers for Medicaid and Medicare Services refused to do that. That's an ER 296 or 269. Is the trial going to have more extensive evidence and it could be conceivably possible that the evidence that a court could be convinced that for transgenders that have gender dysphoria, that I mean, there's a lot of psychiatric implications, there's suicidal ideations, there's all of those things that it could be medically, it could be determined to be medically necessary in certain instances. We're not citing that here, but doesn't the trial have open broader issues? No doubt, and there will be more evidence presented. But you kind of, I think you're scaring me a little bit because you seem to think that if you win the preliminary injunction, that there's nothing else to decide in a trial. And I think that it's a different standard here that we're looking at. And the court was discussing these things in a completely different context, I think as Judge Clifton has said. I'm sure you're Trump. We indicated the scrutiny for reviewing that equal rights protections of transgender persons was more than rational basis, but less than strict scrutiny. What standard do you advocate? I think that we pass either standard. First of all, I think the rational basis applies because this is not a limitation on individuals, it's a limitation on a procedure. We provide treatment to transgender individuals. We simply have decided that this particular procedure has not been determined by the weight of the scientific evidence to be safe and effective treatment for gender dysphoria. And so we limit it the same way we limit, for example, orthotics. And in person who has scoliosis might want to have surgery to correct that condition, but we limit our treatments to orthotics and we don't provide the surgery if an orthotic will get it done. And that's true here. That doesn't mean that we discriminate against disabled people. It just means that we have to make under the federal statutes, funding determinations about procedures we will cover and procedures we won't. And we've determined that at this point, the medical evidence does not support a finding that this particular procedure is safe and effective and is more effective than the other services we do provide counseling, psychotherapy and medications. And so at this point, the state's made that determination. The decision is made directly furthers. Arguments could be made that Bostock covers, goes beyond Title VII and covers transgenders. And if it's an exclusion that discriminates against them, that Karnofsky would say that it's more than rational basis and less than strict scrutiny. Yeah, I don't know how the trial is going to shape that. We're not talking about, but the trial hasn't happened. That's correct. That's correct. So I want to get back to that last, that last notion of does just because transgender individuals, the only people that need this, are they, my time's expired. So I'll stop. Let me find out if anyone else has any questions. No one has any questions, so I'll give you 30 seconds to wrap up. I just want to wrap up with Bray versus Alexander Women's Health Clinic. There, the Supreme Court rejected this logical fallacy that somehow the denial of benefits to one group is discrimination against that group. In that case, the abortion clinic sued to prevent demonstrators, demonstrations outside their clinic. And they argued that they violated federal law because the demonstrations against abortion clinics were necessarily a demonstration against women. Justice Scalia, writing for the court, rejected that, saying some activities may be such an irrational subject to disfavor that if they are targeted, and if they happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed. Attacks on wearing yarmulkes is attacks on Jews. But opposition to voluntary abortion cannot possibly be considered such an irrational surrogate for opposition to a paternalism toward women. Whatever one thinks of for opposing it, other than hatred or condescension toward women. Okay, I've given you enough time to wrap up, so thank you for your comments. Thank you. I'm giving you have two minutes, but did you just have 3.42? Oh, you have 3.42 left. I'm sorry. Go ahead. I'm sorry about that, Your Honor. I forgot to unmute. First, I'd like to quickly address the discussion regarding Bostock. Bostock, there's nothing in that opinion that limits it to Title VII. The statute here, Section 1557, the plain language of that statute is indistinguishable from Title VII and would certainly apply and such that transgender people are covered by Section 1557. I'd like to address also Mr. Barton's reference for the national coverage determination. First of all, there was that 2016 decision, but prior to that in 2014, CMS, in fact, did have an exclusion that was nearly identical to the exclusion that Arizona Medicaid has here, and they decided to eliminate that exclusion because it was unsupported by the evidence and instead moved to a case-by-case determination of whether or not a particular procedure, a particular surgery is medically necessary to treat a beneficiary's gender dysphoria. In 2016, all they did was to say, we're going to stick to the case-by-case determination for surgeries related to the treatment of gender dysphoria for transgender people. That is all we're asking for here, and that is what is being denied John Doe here is the opportunity for access to consider his prior authorization request without applying the exclusion and consider it based on his individualized medical need. That has never been done in this case. In response to that, I would say, Your Honor, that Justice Scalia's language about attacks on a tax on yarmulkes is attacks on Jews is exactly what we have here. The surgeries that are excluded here are excluded because the people who need them are transgender. There is no separation. I would point the court to another Supreme Court case, Nyquist versus Moslet, which was a case involving immigration statute that discriminated based on immigration status. In that case, the Supreme Court said that all that is relevant is that the statute affects immigrants, and immigrants are the only people that are harmed. That is precisely what we have here, is a regulation or an exclusion that targets procedures that only transgender people need. Again, it is tantamount to saying we're not covering surgery for transgender people. Also, I think getting to the point that Judge Kellan asked about the standard of the burden of proof here, heightened scrutiny applies. This is sex discrimination, and as a result, the burden is on the state to demonstrate that they have an exceedingly persuasive justification. Those justifications cannot be post hoc rationalizations. All we have here are lawyer arguments about that it's not medically necessary for John Doe, or that it's not safe and effective. We don't have any evidence as to what the agency considered when this regulation was promulgated. And I think to that point, as well, on the fact that these are lawyer arguments, what we're asking for is that John Doe be allowed to have his individualized medical need for the surgery to be evaluated by access, which it has not done. And I will conclude by asking the court. There's one thing I do want you to comment upon, so I'll just inject it. And that is what I referred to as the second thoughts argument. And that wasn't meant to be light, but it makes it clear what the concern was that was reflected in the district court's order. And he cites a DSM-5 saying that gender dysphoria does not persist into adulthood for most children, suggesting that his concern with regard to this plaintiff, who is 16 now, 15 at the time, filing, is an adolescent. And so the district court suggested, well, maybe the problem here is we're not sure that this condition is going to persist. And that raises a question as to how medically necessary it is and how harmful the failure to order injunctive relief would be for this individual. What do you say to that? Well, your honor, two responses. I think that there is a significant distinction between childhood and adolescence. And so I would, the evidence, at least in Dr. Jansen's declaration, as well as Dr. Schechter's declaration, demonstrates that in adolescence that you don't see those trends or that that concern is not there. And also, he has both his medical and mental health provider both attesting that it is medically necessary for him. And I think the other piece of this, your honor, though, is that all we're asking for is that access consider his individualized medical need. And, you know, once they conduct that analysis, we presume that they're going to do a good faith, that it'll be a good faith review. And so it's not a foregone conclusion that he will get coverage. Although, as I indicated, we do believe that he has more than sufficient evidence to demonstrate that it is medically necessary through that process. All right. Thank you both for your argument. This matter will stand submitted and this court is in recess for the week. Thank you. Thank you. Thank you, your honor.
judges: CLIFTON, CALLAHAN, BRESS